# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

MAGISTRATE JUDGE MASON

UNITED STATES OF AMERICA

v.

DORIAN VAUGHNS

KC FILED
1-17-08
JAN 17 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 0043

I, HOLLY BARRILE, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __July 27, 2005__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did,

knowingly and intentionally distribute a controlled substance, namely, 50 grams or more of a mixture and substance containing cocaine base, in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section(s) __841(a)(1)__.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is
_Official Title_
based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

_/s/ Holly Barrile_
Signature of Complainant

Sworn to before me and subscribed in my presence,

__January 17, 2008__ at __Chicago, Illinois__
Date                                        City and State

_/s/ Michael T. Mason_
Signature of Judicial Officer

MICHAEL T. MASON, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

State of Illinois            )
                             ) SS
County of Cook               )

## AFFIDAVIT

I, Holly Barrile, being first duly sworn on oath, depose and state as follows:

### Background of Affiant

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 1996. In connection with my FBI duties, I investigate criminal violations of the federal narcotic laws, including but not limited to 21 U.S.C. §§ 841, 843, and 846. I also have received specialized training in the enforcement of laws concerning the activities of narcotic traffickers.

2.  The information set forth in this Affidavit is based on my own participation in this investigation, my review of documents and reports related to this investigation, my review of audio and video recordings made during this investigation, information conveyed to me by other local, state, and federal law enforcement officers, and information provided by cooperating witnesses. Because this Affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against DORIAN VAUGHNS, also known as "Dorian Vaughn" and "G-Doe" ("VAUGHNS"), it does not contain everything that I or other law enforcement officers know about VAUGHNS or the events described herein.

### Information Provided by a Cooperating Witness

3.  Some of the information contained in this Affidavit has been provided by a cooperating witness ("CW"). CW has assisted the FBI in ongoing criminal investigations and has

1

cooperated for money and has been reimbursed for expenses. The CW has a previous felony conviction for robbery. Information provided by CW has resulted in 10 arrests and the seizure of narcotics valued at over $270,000, including cocaine, heroin, and marijuana, and therefore the CW has proven reliable. CW is an admitted high-ranking member of the Black P-Stone Nation street gang ("BPSN"). CW has identified VAUGHNS as a high-ranking BPSN member responsible for drug distribution and gang activity in an area on the South Side of Chicago controlled by the BPSN. CW knows VAUGHNS through gang activity.

4. The information provided by the CW in this Affidavit has been corroborated by agents whenever possible by, among other things, the use of electronic recording devices and physical surveillance. I have included my understanding of some of the words and phrases used in the recorded conversations set forth in the Affidavit. My understanding is based on the content and context of the conversations, information provided by the CW who participated in the recorded conversation, my training and experience, and the experience of other law enforcement officers.

### The July 27, 2005 Drug Transaction

5. On July 27, 2005, agents met with CW for the purpose of having CW purchase two and one-quarter ounces (approximately 63 grams) of crack cocaine from VAUGHNS. The CW and VAUGHNS had previous unrecorded conversations in which VAUGHNS offered to sell crack cocaine to CW.

6. At approximately 11:35 a.m., CW made a consensually-recorded phone call to VAUGHNS. During that call, the CW advised that s/he was ready to complete the transaction. VAUGHNS advised that CW would have to wait until VAUGHNS returned from court. At about 11:43 a.m., the CW placed another recorded telephone call to VAUGHNS. During this call, the CW

told VAUGHNS to call when he was out of court. At about 2:15 p.m., the CW placed another recorded telephone call to VAUGHNS. During this call, the CW and VAUGHNS agreed to meet in the area of 87th Street and Loomis in Chicago. After the phone call, agents searched CW and his/her vehicle for weapons, drugs, contraband and/or excessive money; none was found. CW was fitted with an audio and video recording device, and provided with $2600 in pre-recorded government funds (the CW was provided with money in excess of the anticipated purchase price to make him appear like a legitimate drug dealer).

7. Followed by agents, CW then drove to the area of 87th Street and Loomis. At approximately 2:49 p.m., the CW met with VAUGHNS on the corner of 88th and Loomis. VAUGHNS entered the passenger side of the CW's vehicle. CW counted out $1,300 of the pre-recorded funds. VAUGHNS assisted the CW in counting the money by telling the CW to count fifteen twenty dollar bills for the final $300. The CW confirmed with VAUGHNS the price of $1300 and handed him the money. VAUGHNS then placed a telephone call and told the CW, "he said it would be about an hour." The CW kept the remaining $1300.

8. Followed by agents, the CW then drove VAUGHNS to 8833 S. Beverly in Chicago, then to Church's Chicken where VAUGHNS purchased food, and then returned to 88th and Loomis. VAUGHNS exited the CW's vehicle and brought the food into 8800 S. Loomis. The CW remained in the vehicle. VAUGHNS returned to the CW's vehicle and instructed the CW to return to 8833 S. Beverly. The CW parked the vehicle on the street in front of 8833 S. Beverly. VAUGHNS and the CW remained inside the CW's vehicle during this time.

9. At approximately 4:20 p.m., VAUGHNS received a telephone call. VAUGHNS was overheard saying, "I'm outside (pause) yep." According to the CW, the CW then observed a dark

colored van arrive and park behind the CW's vehicle. VAUGHNS exited the CW's vehicle and walked directly to the dark colored van. The CW called agents and told them that he observed VAUGHNS meeting with the driver of the van.

10. VAUGHNS walked directly to the CW's vehicle after meeting with the driver of the van. VAUGHNS entered the CW's vehicle at approximately 4:23 p.m., sat in the front passenger seat, and said, "which one do you want?" VAUGHNS handed the CW two clear plastic bags, each containing suspected crack cocaine. The CW picked one of the bags and handed the other back to VAUGHNS. VAUGHNS told the CW, "I'm gonna put mine in the house, you want me to put it on the clock, check it out for you?" suggesting that they weigh the crack cocaine. The CW responded, "no" and VAUGHNS said he has a "clock" (scale) in the house. VAUGHNS told the CW that he would bring the scale out and told the CW "to go on the porch." VAUGHNS and the CW exited the vehicle and walked toward the front door of 8833 S. Beverly. The CW remained on the porch of 8833 S. Beverly while VAUGHNS went inside the residence. VAUGHNS exited the residence with a digital scale. The CW placed the bag of crack cocaine on the scale, which read 63 grams. The CW and VAUGHNS returned to the CW's vehicle.

11. Followed by agents, the CW drove VAUGHNS back to 88th and Loomis where VAUGHNS exited the vehicle. The CW then proceeded directly to a pre-determined location where agents retrieved the audio/video recorder, the suspected crack cocaine and remaining $1300. The CW and his/her vehicle were again searched for weapons, drugs, contraband and any excessive funds; none were found.

12. The suspected crack cocaine was subsequently tested by the DEA laboratory, which concluded that the substance contained 62.3 grams of a chunky, off-white substance containing

4

cocaine base.

13. I believe that the substance purchased from VAUGHNS was cocaine base in the form of crack cocaine based on, among other things: (1) my experience as a law enforcement officer; and (2) a visual inspection of the substance itself.

14. Based on the foregoing, I respectfully submit that there exists probable cause to believe that DORIAN VAUGHNS knowingly and intentionally distributed a controlled substance, namely, fifty grams or more of a mixture and substance containing cocaine base, in the form of "crack" cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

_____
HOLLY BARRILE
SPECIAL AGENT, FEDERAL BUREAU
OF INVESTIGATION

Sworn to and subscribed to before me on
this 17th day of January 2008.

_____
MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE

5